# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 10, 2012

No. 11-10774

Lyle W. Cayce
Clerk

In the Matter of: PILGRIM'S PRIDE CORP, formerly known as WLR Foods, Incorporated, formerly known as AgraTech Seeds, Incorporated, formerly known as Wampler Foods, Incorporated, formerly known as Gold Kist, Incorporated, formerly known as Pilgrims Pride Corporation of Georgia, Incorporated, formerly known as GK Peanuts, Incorporated, formerly known as WLR, formerly known as Pilgrims Pride Corporation of Virginia, Incorporated, formerly known as Pilgrims Pride Corporation of Delaware, Incorporated,

Debtor,

-------------------------------------------------

CRG PARTNERS GROUP, L.L.C.,

Appellee,

v.

WILLIAM T. NEARY, In His Capacity as the United States Trustee for Region 6,

Appellant.

Appeals from the United States Bankruptcy
Court for the Northern District of Texas

No. 11-10774

Before STEWART, ELROD, and SOUTHWICK, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

In this case, we must determine whether the Supreme Court's decision in *Perdue v. Kenny A. ex rel Winn*, 130 S. Ct. 1662 (2010)—which curtailed the authority of district courts to award fee enhancements in federal fee-shifting cases—unequivocally, *sub silentio* overruled our circuit's precedent in the bankruptcy arena. We hold that it does not. Therefore, we AFFIRM.

I.

On December 1, 2008, Pilgrim's Pride Company and six of its affiliates (collectively, the "Debtors") filed for chapter 11 bankruptcy protection. At that time, the Debtors' prospects for a successful reorganization were far from promising. They had lost approximately $1 billion in the fiscal year preceding their bankruptcy filing and were operating at a negative annual cash flow of over $300 million. The Debtors anticipated that unsecured creditors would receive, at best, a debt for equity swap, and that pre-petition shareholders would be left empty-handed.

Upon receiving the bankruptcy court's approval, the Debtors retained CRG Partners Group, LLC to provide William Snyder as their chief restructuring officer and other personnel to assist in their chapter 11 restructuring process. "CRG was highly effective throughout th[e] [restructuring] process and facilitated a number of changes, including the replacement of certain executive officers and the development and implementation of a new business model." *CRG Partners, LLC v. U.S. Tr.*, 445 B.R. 667, 668 (N.D. Tex. 2011).

With CRG's assistance, the Debtors prepared a bankruptcy plan that was confirmed by the bankruptcy court on December 10, 2009, just over a year after the petition date. The plan was an absolute success. It provided for a 100% return to all of the Debtors' secured and unsecured creditors, and the Debtors' pre-petition shareholders received $450 million in new equity interests.

No. 11-10774

Once the plan was confirmed, CRG sought the bankruptcy court's approval of $5.98 million in fees calculated in accordance with the lodestar method. CRG also requested approval of a $1 million fee enhancement[1] that the Debtors' board of directors had recommended be paid to CRG. No party objected to the $5.98 million fee request, and that request was approved by the bankruptcy court. The United States Trustee did object, however, to the $1 million fee enhancement, "acknowledging the excellent performance of CRG but nevertheless asserting that CRG had already received adequate compensation."[2] *CRG Partners*, 445 B.R. at 668.

After holding an evidentiary hearing, the bankruptcy court found that CRG had provided superior services that contributed to the outstanding results in the Debtors' bankruptcy case. Specifically, the court stated that:

> [T]he result in this case [was] rare and exceptional. One hundred percent dividend cases are rare in Chapter 11, and rarer still in large cases such as this. And what made this case truly exceptional was that it emerged from bankruptcy in about a year, and the Court can't begin to estimate how much was saved in administrative costs due to this quick emergence from bankruptcy.

It also concluded "the evidence showed that Mr. Snyder contributed significantly to the superior results in" the case. Nonetheless, the bankruptcy court denied CRG's enhancement request because CRG failed to satisfy the strict requirements of the Supreme Court's 2010 holding in *Perdue*, 130 S. Ct. at 1662.

CRG appealed the decision to the district court, which held that the bankruptcy court erred in treating the federal fee-shifting decision in *Perdue* as binding authority in a bankruptcy proceeding. *CRG Partners*, 445 B.R. at 672–73. Notably, the district court opined that "[i]t is one thing for a court to

---

[1] Throughout this opinion, we also refer to fee "enhancements" as "upward adjustments" of the lodestar.

[2] No other party filed an objection to CRG's request for a $1 million fee enhancement.

3

No. 11-10774

seek guidance from a case decided in a different context; it is another thing entirely for a court to allow such a case to displace its previously-established precedent." *Id.* at 1672. The district court reversed the bankruptcy court's decision and remanded the case for further proceedings. *Id.* at 1673.

On remand, the bankruptcy court relied on its prior decision in *In re Mirant Corp.*, 354 B.R. 113 (Bankr. N.D. Tex. 2006), which held that four specific factors must be satisfied in order for a professional to receive an enhancement pursuant to § 330(a). The bankruptcy court awarded CRG the $1 million fee enhancement after finding that it had met all four *Mirant* factors. The bankruptcy court then certified its order for direct appeal to this court, and we granted the parties' motions for leave to appeal the order pursuant to 28 U.S.C. § 158(d)(2).

## II.

The Trustee raises one issue on appeal. He contends that the district court erred in reversing the bankruptcy court because *Perdue* narrowly circumscribed the bankruptcy court's discretion to grant fee enhancements. The Trustee requests that we reverse the bankruptcy court's order under *Mirant* and "reinstate the bankruptcy court's order entered on June 21, 2010 denying the requested bonus under *Perdue*."

CRG counters that *Perdue* was not intended to upend our settled precedent concerning fee enhancements in bankruptcy proceedings. CRG requests that we affirm the bankruptcy court's order under *Mirant* because "*Perdue* does not control fee enhancement requests in bankruptcy cases."

Before we can reach the merits of the parties' arguments, we first must discuss our: (1) framework for analyzing applications for compensation under the Bankruptcy Code; and (2) case law specifically addressing fee enhancements in bankruptcy proceedings. This discussion is critical to resolving the ultimate question presented in this case: whether *Perdue* extends to bankruptcy cases.

No. 11-10774

A.

We begin with a brief review of the relevant precepts that have governed the compensation of professionals employed by the estate for over three decades. First, in the year preceding the enactment of the Bankruptcy Code in 1978, we held that bankruptcy courts must address the following twelve *Johnson* factors when determining reasonable attorney's fees under the Bankruptcy Act of 1898:

> (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases.

*In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1298–99 (5th Cir. 1977) (quoting *Johnson v. Ga. Highway Express, Inc.* 488 F.2d 714, 717–19 (5th Cir. 1974)). We explained that, although the *Johnson* factors were established in the context of a fee-shifting statute under Title VII of the Civil Rights Act of 1964, "the guidelines we established there are equally useful whenever the award of reasonable attorneys' fee is authorized by statute." *Id.* at 1299.

We also recognized, however, that the unique nature of proceedings under the Bankruptcy Act merited consideration of two additional factors. *Id.* First, in light of the "strong policy of the Bankruptcy Act that estates be administered as efficiently as possible," bankruptcy courts were required to award fees that were "at the lower end of the spectrum of reasonableness." *Id.* (quotation omitted). Second, we advised bankruptcy courts to remain vigilant that there were "a number of peculiarities of bankruptcy practice such as the award of ad interim allowances and the possibility that some officers of the court may be furnishing services to the estate in more than one capacity which could lead to

5

No. 11-10774

the award of duplicative fees or compensation for non-legal services if overlooked." *Id.*

Next, in another case decided under the Bankruptcy Act, we held that the lodestar method for calculating reasonable attorney's fees applied in the bankruptcy arena. *In re Lawler*, 807 F.2d 1207, 1211 (5th Cir. 1987).[3] The lodestar amount "is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work." *Id.* We further explained that, after calculating the lodestar, bankruptcy courts retained the discretion to adjust the lodestar upwards or downwards to reflect their consideration of the *Johnson* factors. *Id.*

This framework was then slightly modified for cases governed by the Bankruptcy Code. In addition to considering the lodestar and the *Johnson* factors, bankruptcy courts became required to consult 11 U.S.C. § 330(a), the Bankruptcy Code provision governing compensation of professionals employed by the estate.[4] *See In re Cahill*, 428 F.3d 536, 539–40 (5th Cir. 2005); *In re Fender*, 12 F.3d 480, 487 (5th Cir. 1994). As discussed in II.B., *infra*, the original language of § 330(a) was—and, despite subsequent minor amendments, has remained—quite similar to the rule that governed professional compensation under the Bankruptcy Act. The only major change effected by the Code was the

---

[3] Although *Lawler* was decided nine years after the Bankruptcy Code's enactment, the debtor's bankruptcy case was initiated before its enactment, and the case was therefore governed by the Bankruptcy Act. *Id.* at 1209–10.

[4] Professionals' fees may also be awarded pursuant to 11 U.S.C. § 328. *See also In re Texas Sec., Inc.*, 218 F.3d 443, 445 (5th Cir. 2000) ("We have interpreted § 328 to limit the power of the bankruptcy court to alter the compensation of professionals: '[t]he court must therefore set the compensation award either according to § 328 or § 330. If prior approval is given to a certain compensation, § 328 controls and the court starts with that approved compensation, modifying it only for developments unforeseen when originally approved.'" (quoting *In re Nat'l Gypsum Co.*, 123 F.3d 861, 862–63 (5th Cir. 1997))). However, both parties agree that the provision governing CRG's compensation is § 330. Section 328 is inapplicable in this case.

No. 11-10774

abandonment of the Act's "economy of the estate" consideration. *See* 3 Collier on Bankruptcy § 330.03[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009) ("In other respects [unrelated to the 'economy of the estate' factor], most of the criteria [between the Act and the Code] are the same . . . ."). This enabled bankruptcy professionals to earn fees comparable to those earned by non-bankruptcy practitioners. *See* 11 U.S.C. § 330(a)(3)(F); *In re Babcock & Wilcox Co.*, 526 F.3d 824, 827 (5th Cir. 2008) ("Prior to being amended in 1978, this statute favored economy of the estate over competitive compensation to attorneys for the debtors.") (citation and internal quotation marks omitted).

The current version of § 330(a) provides, in relevant part, that a bankruptcy court may award "a professional person employed under section 327 or 1103 . . . reasonable compensation for actual, necessary services." 11 U.S.C. § 330(a)(1)(A). It also sets forth a non-exclusive list of factors for courts to examine when determining the reasonableness of fees requested by professionals:

> (3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including–
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

No. 11-10774

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3); *see also In re Lan Assocs. XI, L.P.*, 192 F.3d 109, 123 (3d Cir. 1999) (explaining that "in spite of the factors enumerated in § 330, many courts continue to employ the twelve factors set forth in *Johnson*," and holding that "the factors enumerated in section § 330(a) [sic] are not all-inclusive").[5]

Following the Bankruptcy Code's enactment, we made clear that the lodestar, *Johnson* factors, and § 330 coalesced to form the framework that regulates the compensation of professionals employed by the bankruptcy estate. *See Cahill*, 428 F.3d 539–40. Under this framework, bankruptcy courts must first calculate the amount of the lodestar. *Id.* at 539. After doing so, the courts "then may adjust the lodestar up or down based on the factors contained in § 330 and [their] consideration of the twelve factors listed in *Johnson*." *Id.* at 540. We also have emphasized that bankruptcy courts have "considerable discretion" when determining whether an upward or downward adjustment of the lodestar is warranted.[6] *Id.*

---

[5] Section 330(a)(3)'s list of factors was not found in the original version of the statute but was included in a 1994 amendment to the Code. *See* Bankruptcy Reform Act of 1994, Pub. L. No. 103–394, § 224, 108 Stat. 4106 (1994).

[6] We explained the rationale for this broad discretion in *Lawler*:

[T]his Court emphasizes that the bankruptcy court has broad discretion in determining compensation for services performed in a bankruptcy proceeding and that its exercise of discretion will not be disturbed unless it has been abused. *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1252 (5th Cir.1986). The bankruptcy court is more familiar with the actual services performed and "has a far better means of knowing what is just and reasonable than an appellate court can have." *First Colonial*, 544 F.2d at 1298 (citation omitted).

No. 11-10774

However, as we held in *Fender*, bankruptcy courts must remain mindful, that "[f]our of the *Johnson* factors—the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, and the results obtained from the litigation—are presumably fully reflected in the lodestar amount." *Fender*, 12 F.3d at 487 (quoting *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993). Accordingly, those four *Johnson* factors may only form the basis for an upwardly adjusted fee in rare and exceptional circumstances: "[a]lthough upward adjustments of the lodestar figure based on these [four] factors are still permissible, such modifications are proper only in certain rare and exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts." *Id.* (quoting *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993)); *see also Cahill*, 428 F.3d at 540 (bankruptcy court must "explain the weight given to each factor that it considers and how each factor affects its award").

B.

With this framework in mind, we now turn to our previous decisions that specifically addressed the reasonableness of fee enhancements in the bankruptcy context. First, in *Rose Pass Mines, Inc. v. Howard*, which was decided under the Bankruptcy Act, we determined that the bankruptcy court did not abuse its discretion in awarding a 16% enhancement to the fee earned by the debtor's attorney. 615 F.2d 1088, 1092 (5th Cir. 1980). After consulting the *Johnson* factors, the bankruptcy court had awarded the enhancement because the debtor's attorney: (1) provided "excellent services" that helped produce an "unusually good result"; (2) "evidenced a very high degree of expertise and competence in various areas of the law"; and (3) obtained "outstanding results" in the form of a 100% dividend to all creditors. *Id.* at 1090–92, 1091 n.6, 8.

---

807 F.2d at 1211.

No. 11-10774

Based on these findings, we held that the 16% fee enhancement constituted reasonable compensation under the Bankruptcy Act. *Id.* at 1092.

Similarly, in *Lawler*, we held that it was reasonable under *Johnson* to enhance the lodestar by 70% based primarily on the contingent structure of counsel's employment as well as on the unusual nature of the case, novel legal questions presented, exceptional results obtained for the estate's creditors, and counsel's "outstanding professional accomplishment" in handling the case. 807 F.2d at 1213. This high praise and significant fee enhancement was justified because the estate's attorneys transformed a valueless estate into one worth approximately $29 million. *Id.* at 1209. The substantial and unexpected recovery enabled the confirmation of a bankruptcy plan that provided for a 100% return to all creditors and a return of approximately $8.8 million to the previously insolvent debtor. *Id.* Accordingly, while explicitly acknowledging the Bankruptcy Act's requirement that fees must remain "within the lower spectrum of reasonableness," we held that a 70% enhancement of the lodestar based on the *Johnson* factors was appropriate.[7] *Id.* at 1213–14 (internal quotation marks omitted).

We recognize that both *Rose Pass Mines* and *Lawler* were decided under the Bankruptcy Act. However, notwithstanding the enactment of the Bankruptcy Code, this precedent remains intact. With regard to *Rose Pass Mines* in particular, we already held as much in *Consolidated Bancshares*, 785 F.2d at 1249. In that case, the debtor's counsel sought a fee enhancement under § 330 and *Rose Pass Mines* based on counsel's alleged substantial recovery for the estate. *Id.* The bankruptcy court denied the enhancement and the district court affirmed the decision. *Id.* at 1251. We subsequently affirmed, holding that although counsel's efforts were certainly laudable, the bankruptcy court acted

---

[7] The bankruptcy court had awarded a 130% enhancement of the lodestar, which we reduced to 70%. *Id.* at 1212, 1214.

No. 11-10774

within its broad discretion in denying the enhancement. *Id.* at 1257. Despite this outcome, *Consolidated Bancshares* is significant because, in rejecting the appellant's arguments, we reaffirmed that bankruptcy courts retain discretion to "enhance a fee for a job performed in an excellent manner":

> A high level of expertise in a complicated reorganization case does not automatically warrant a bonus. *Southwestern Media Inc. v. Rau*, 708 F.2d 419, 428 (9th Cir.1983). Moreover, the attorneys for the debtor had the opportunity at the evidentiary hearing to show that the settlement achieved in the case would have been lost but for their efforts. From the record, this court can discern no abuse of discretion in the bankruptcy court's ruling that the fine job done by debtor's attorneys is properly compensable by their hourly rate without a bonus. . . . We note in passing that the case relied on by debtor's counsel *stands only for the proposition that the bankruptcy judge does not abuse his discretion when he enhances a fee for a job performed in an excellent manner*. *Rose Pass Mines*, 615 F.2d at 1092. Similarly, a bankruptcy judge does not abuse his discretion when he decides not to enhance the hourly fee with a bonus.

*Id.* at 1257 (emphasis added). By explaining the current meaning of *Rose Pass Mines* in a case governed by the Bankruptcy Code, we made clear to bankruptcy courts that our holding remained precedential. And it appears that the bankruptcy courts did not overlook this significant aspect of *Consolidated Bancshares* as they have continued to rely on *Rose Pass Mines* even though it was decided under the Bankruptcy Act. *See In re ASARCO LLC*, 2011 WL 2974957, at *36 (Bankr. S.D. Tex. July 20, 2011); *In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 574, 578 (Bankr. N.D. Tex. 2004); *In re Farah*, 141 B.R. 920, 925 (Bankr. W.D. Tex. 1992).

Although we have not explicitly reaffirmed *Lawler* in the same manner as *Rose Pass Mines*, we have cited the decision favorably in multiple cases that were decided under the Bankruptcy Code, thereby indicating that the decision continues to stand. *See In re DP Partners Ltd. P'ship*, 106 F.3d 667, 674 n.29 (5th Cir. 1997) (citing *Lawler* for the proposition that "*Johnson* and its progeny"

govern awards of professional compensation pursuant to 11 U.S.C. § 503(b)(4));
*In re Anderson*, 936 F.2d 199, 204 (5th Cir. 1991) (citing *Lawler* after explaining
that bankruptcy courts "ha[ve] broad equitable—and hence
discretionary—powers to award attorney's fees"); *In re Evangeline Refining Co.*,
890 F.2d 1312, 1326 (5th Cir. 1989) (relying on *Lawler* when explaining the level
of detail that must be included in a fee application). There is also little reason
not to extend to *Lawler* the same favorable treatment that *Rose Pass Mines*
enjoys. Although case-specific distinctions exist, both decisions upheld
enhancements of the lodestar because the estate's counsel provided *outstanding
services* that generated *exceptional results* in the form of a 100% return to all
creditors.

Moreover, the survival of *Rose Pass Mines* and *Lawler* is far from
groundbreaking, as § 330(a) is substantially similar to the Bankruptcy Act
provision it replaced, and the only material distinction between the relevant
provisions supports our reaffirmation of the two cases. *See also* 3 Collier on
Bankruptcy § 330.03[2] ("[M]ost of the criteria are the same and prior
[Bankruptcy Act] case law *remains relevant*.") (emphasis added). When
determining reasonable compensation under the Bankruptcy Act, Bankruptcy
Rule 219(c)(1) instructed bankruptcy courts to give "due consideration to the
*nature, extent, and value* of the services rendered as well as to the *conservation
of the estate* and the interests of creditors." *Rose Pass Mines*, 615 F.2d at 1091
(emphasis added). Similarly, as it first appeared in 1978, § 330(a)(1) authorized
courts to award "reasonable compensation for actual, necessary services . . .
based on the time, the *nature*, the *extent*, and the *value* of such services, and the
*cost of comparable services* other than in a case under this title . . . ." Act of Nov.
6, 1978, ch. 3, Pub. L. No. 95–598, § 330, 92 Stat. 2549 (1978). Thus, the only
significant shift in the law was that Congress removed the "conservation of the
estate" consideration—which required courts to award fees "at the lower end of

No. 11-10774

the spectrum of reasonableness"—so that bankruptcy professionals could be paid fees comparable to those earned for similar services in the non-bankruptcy arena. *See also* 3 Collier on Bankruptcy § 330.03[2] ("The economy factor was abandoned under the Bankruptcy Code in favor of the new policy that attorneys engaged in bankruptcy cases should receive compensation in parity with that received by attorneys performing services in comparable situations."). Otherwise, the relevant Bankruptcy Act and Bankruptcy Code compensation provisions were nearly identical. And these similarities persist today. *See* 11 U.S.C. § 330(a). Accordingly, there is a solid textual foundation buttressing our conclusion that *Rose Pass Mines* and *Lawler* survived the Code's enactment: if enhancements were possible when fees were awarded "at the lower end of the spectrum of reasonableness," then they surely remained possible after that ceiling was removed and the statutory text was otherwise unchanged.

Our conclusion is also supported by the two compensation decisions we rendered after deciding *Consolidated Bancshares*. In *Fender*,[8] we reiterated that a bankruptcy court may adjust "the lodestar upward or downward depending upon the respective weights of the twelve factors set forth in *Johnson*."[9] 12 F.3d at 487. We explained, however, that the court's discretion to adjust the fee upwards is partially constrained by the lodestar, which is presumed to fully account for four of the twelve *Johnson* factors—"the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, and the results obtained by the litigation." *Id.* at 488 (quoting

---

[8] We note that the fee awarded in *Fender* was not owed by the estate to its attorneys pursuant to § 330. *See* 12 F.3d at 484. Because the award was not governed by § 330, *Fender* only constitutes persuasive authority. We nevertheless consult the case because it addresses the lodestar and *Johnson* factors in the bankruptcy arena.

[9] Although we did not cite *Lawler* in support of this proposition, the statement is consistent with our previous discussion in *Lawler*. *See Lawler*, 807 F.2d at 1213 ("They are well entitled under the application of the *Johnson* factors to an award significantly above the lodestar.").

13

No. 11-10774

*Shipes*, 987 F.3d at 320).  A court may overcome this presumption and "double count" one or more of these presumably subsumed *Johnson* factors "only in certain rare and exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts."[10]  *Id.* (quoting *Shipes*, 987 F.3d at 320).  In the underlying case, we reversed the bankruptcy court's 70% fee enhancement because: (1) it was a "substantial upward departure from the lodestar" based on the presumably subsumed *Johnson* factors; and (2) "[n]othing in the bankruptcy court's findings show[ed] th[e] case to be 'rare and exceptional.'"  *Id.*

Finally, we most recently analyzed professional compensation in *Cahill*, 428 F.3d 536.  In that case, the bankruptcy court had refused to award the full amount of the $3,758.08 requested by counsel for the chapter 13 debtor, and instead limited counsel's fee award to $1,737.00, which was the pre-calculated lodestar rate for chapter 13 bankruptcies filed in the Southern District of Texas.[11]  *Id.* at 538–39.  We explained that, after calculating the lodestar, a "court then may adjust the lodestar up or down based on the factors contained

---

[10] The *Fender* opinion also includes language that, when viewed in isolation, is internally inconsistent with its analysis and ultimate holding.  Specifically, *Fender* states that "[t]he lodestar may be adjusted according to a *Johnson* factor only if that factor is not already taken into account by the lodestar" and cites *Shipes*, 987 F.3d at 319–20 in support of that proposition.  *Id.* at 487.  When this language is viewed in the context of the opinion as a whole, it is clear that the four factors subsumed by the lodestar may still be "double counted" in rare and exceptional cases.  Thus, we refrain from viewing this contradictory language in isolation.

[11] The pre-calculated lodestar was found in General Order 2004-5, which "provide[d] bankruptcy courts with reasonable attorney time estimates for completing a 'typical' Chapter 13 case and customary rates for Chapter 13 services in the Southern District of Texas, which, when multiplied together, yield[ed] a typical lodestar amount of $1737."  *Id.* at 540.  This "typical" lodestar amount enabled courts to dispose of "run-of-the-mill Chapter 13 fee applications expeditiously and uniformly."  *Id.* at 541.  "General Order 2004-5 nevertheless anticipate[d] that bankruptcy courts evaluating traditional fee applications [would] continue to analyze and adjust fee applications on a case-by-case basis using the lodestar analysis and flexible *Johnson* factors, ensuring that the lodestar amount in an *atypical* case [would] be adjusted to reflect the specifics of that case."  *Id.*

in § 330 and its consideration of the twelve factors listed in *Johnson*." *Id.* at 540. We held, however, that the bankruptcy court did not abuse its discretion in refusing to enhance the pre-calculated lodestar rate up to the $3,758.08 sought by the debtor's counsel because:

> [The bankruptcy court's] findings that Walker & Patterson's attorneys spent an unreasonable amount of time on the case, duplicated each other's efforts, performed unnecessary work, were unprepared for the confirmation hearing, and were handling a case that presented no novel or complex issues support[ed] its conclusion that this case did not warrant an upward adjustment of the lodestar amount under § 330 or *Johnson*.

*Id.* at 541. Thus, although we declined to enhance the lodestar, our analysis indicated that enhancements are certainly possible when warranted by § 330 or the *Johnson* factors.

In sum, we have consistently held that bankruptcy courts have broad discretion to adjust the lodestar upwards or downwards when awarding reasonable compensation to professionals employed by the estate pursuant to § 330(a). However, this discretion is far from limitless. Upward adjustments, for instance, are still only permissible in rare and exceptional circumstances—such as in *Rose Pass Mines* and *Lawler*, where the applicants had provided superior services that produced outstanding results—that are supported by detailed findings from the bankruptcy court and specific evidence in the record.

## III.

We now address the focal point of this case: whether the Supreme Court's fee-shifting decision in *Perdue* unequivocally, *sub silentio* overruled our circuit's bankruptcy precedent.

## A.

In *Perdue*, the Supreme Court analyzed "whether the calculation of an attorney's fee, *under federal fee-shifting statutes*, based on the 'lodestar' . . . may

be increased due to superior performance and results." 130 S. Ct. at 1669 (emphasis added). The underlying case dealt with a class action lawsuit commenced by approximately 3,000 children in the Georgia foster care system against the Governor of Georgia and various state officials, alleging violations of their constitutional and statutory rights. *Id.* The plaintiffs reached a favorable settlement and their attorneys sought their fees from the defendants pursuant to 42 U.S.C. § 1988, which provides, in pertinent part, that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." *Perdue*, 130 S. Ct. at 1670. The district court calculated a $6 million lodestar figure and then enhanced the award by 75% based on: (1) the attorneys' advancement of $1.7 million of expenses over three years without receiving any reimbursements; (2) the absence of on-going pay to the attorneys; (3) the fully contingent nature of the case; and (4) the attorneys' extraordinarily high degree of "skill, dedication, and professionalism." *Id.* The district court also found that the results obtained in the case were truly extraordinary, explaining that "after 58 years as a practicing attorney and federal judge, the Court is unaware of any other case in which a plaintiff class has achieved such a favorable result on such a comprehensive scale." *Id.* (citation and alteration omitted).

The Supreme Court began its discussion by explaining that the text of § 1988 "[u]nfortunately . . . does not explain what Congress meant by a 'reasonable' fee, and therefore the task of identifying an appropriate methodology for determining a 'reasonable' fee was left for the courts." *Id.* at 1671. The twelve *Johnson* factors were the first attempt at such a methodology. *Id.* at 1671–72. However, "[t]his method 'gave very little guidance to the district courts," and "placed unlimited discretion in trial judges and produced disparate results." *Id.* at 1672 (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563 (1986) (*Delaware Valley I*)). The Court then

referenced the emergence of an "alternative approach" in the form of the lodestar method, which eventually became "the guiding light of our fee-shifting jurisprudence." *Id.* (citation omitted). According to the Court, "unlike the *Johnson* approach, the lodestar calculation is objective . . . and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces predictable results." *Id.* (internal citation and quotation marks omitted).

The Court next summarized the "important rules" from its prior decisions concerning federal fee-shifting statutes that led to its holding in *Perdue*. *Id.* "First, a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case."[12] *Id.* (citing *Delaware Valley I*, 478 U.S. at 565). "Second, the lodestar method yields a fee that is presumptively sufficient to achieve this objective." *Id.* at 1673. Third, fee enhancements "may be awarded in rare and exceptional circumstances." *Id.* (citations and internal quotation marks omitted). Fourth, the lodestar "includes most, if not all, of the relevant factors constituting a reasonable attorney's fee and . . . an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." *Id.* (internal citation and quotation marks omitted). "Finally, a fee applicant seeking an enhancement must produce specific evidence that supports the award."[13] *Id.*

---

[12] In *Delaware Valley I*, the Court held that:

> These [fee-shifting] statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws.

478 U.S. at 565.

[13] The Court also stated a sixth rule, that the burden of proving an enhancement is borne by the applicant. *Id.* This rule is not relevant in this case.

No. 11-10774

The Court then moved to the precise issue presented in the case: "whether there are circumstances in which superior attorney performance is not adequately taken into account in the lodestar calculation."[14] *Id.* at 1674. The Court held that only the following three rare and exceptional circumstances could justify a fee enhancement based on superior performance: (1) when "the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value"; (2) "if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted"; and (3) when there is an "exceptional delay in the payment of fees," especially "where the delay is unjustifiably caused by the defense." *Id.* at 1674–75. Any enhancement must be based, however, on objective criteria that are capable of being reviewed by an appellate court.[15] *Id.* The Court then reversed and remanded because the district court failed to provide proper, objective justification for the significant fee enhancement. *Id.* at 1675–77.

We further note that *Perdue's* holding was founded primarily upon justifications that are unique to cases governed by § 1988 or other fee-shifting statutes. For example, the Court explained that the second and third circumstances arise only in rare and exceptional cases because attorneys in fee-shifting cases generally understand that they will not receive attorney's fees or

[14] The Court was originally "asked to decide whether either the quality of an attorney's performance or the results obtained are factors that may properly provide a basis for an enhancement." *Id.* However, the Court determined that those two factors should be treated as one because "superior results are relevant only to the extent it can be shown that they are the result of superior attorney performance." *Id.*

[15] For instance, with regard to the second circumstance, the Court provided that "the amount of the enhancement must be calculated using a method that is reasonable, objective, and capable of being reviewed on appeal, such as by applying a standard rate of interest to the qualifying outlays of expenses." *Id.* at 1674.

expense reimbursements until the end of a case.[16]  *Id.* at 1674–75.  The Court also commented that defendants are less likely to settle when there is uncertainty regarding the amount of fees that could be awarded by a judge who is relying on his "subjective opinion regarding particular attorneys or the importance of the case."  *Id.* at 1676.  And the Court made clear that the ultimate burden of paying for attorney's fee enhancements in § 1988 cases is often borne by taxpayers:

> Section 1988 serves an important public purpose by making it possible for persons without means to bring suit to vindicate their rights.  But unjustified enhancements that serve only to enrich attorneys are not consistent with the statute's aim.  In many cases, attorney's fees awarded under § 1988 are not paid by the individuals responsible for the constitutional or statutory violations on which the judgment is based.  Instead, the fees are paid in effect by state and local taxpayers, and because state and local governments have limited budgets, money that is used to pay attorney's fees is money that cannot be used for programs that provide vital public services.

*Id.* at 1676–77 (footnote omitted).

### B.

The Trustee argues that we should extend *Perdue* to the bankruptcy arena because the decision clarifies how to apply the lodestar method, cabins the discretion of bankruptcy judges, and leads to more uniform and predictable results.  We decline this invitation because *Perdue* did not unequivocally, *sub silentio* overrule our legion of precedent in the field of bankruptcy.

### 1.

In this circuit, we abide by the rule of orderliness.  *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012).

---

[16] *See id.* at 1674 ("[W]hen an attorney agrees to represent a civil rights plaintiff who cannot afford to pay the attorney, the attorney presumably understands that no reimbursement is likely to be received until the successful resolution of the case, . . . and therefore enhancements to compensate for delay in reimbursement for expenses must be reserved for unusual cases.") (internal citation omitted).

Under this rule, a panel of three judges may not unilaterally overrule or disregard the precedent that has been established by our previous decisions. *Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 383 (5th Cir. 1999) ("[T]he rule of orderliness forbids one of our panels from overruling a prior panel."); *Dornbusch v. Comm'r*, 860 F.2d 611, 612 n.1 (5th Cir. 1988) ("We recognize, of course, that one panel of this Court 'cannot disregard the precedent set by a prior panel.'" (quoting *Wilson v. Taylor*, 658 F.2d 1021, 1034 (5th Cir. 1981))). In order for one panel to overrule another, there must be "an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or by our *en banc* court." *Technical Automation*, 673 F.3d at 405 (quoting *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)). Furthermore, we exercise restraint when determining whether a Supreme Court decision has produced an intervening change in the law: "for a Supreme Court decision to change our Circuit's law, it must be more than merely illuminating with respect to the case before the court and must unequivocally overrule prior precedent." *Id.* (citations, internal quotation marks, and alterations omitted).

We recently followed the rule of orderliness in *Technical Automation*. In that case, we considered whether the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), which held that Article I bankruptcy courts lacked constitutional authority to enter final judgment on certain state law counterclaims, should be extended so as to circumscribe the authority of Article I magistrate judges to enter final judgments. *Technical Automation*, 673 F.3d at 406. Despite acknowledging the "many similarities" between the statutory powers of bankruptcy judges and those of magistrate judges, we declined this invitation to extend *Stern*. *Id.* at 406–07. Instead, we held that the rule of orderliness prevented such an outcome because *Stern* did not unequivocally overrule our contrary precedent:

No. 11-10774

> Although the similarities between bankruptcy judges and magistrate judges suggest that the Court's analysis in *Stern* could be extended to this case, the plain fact is that our precedent in *Puryear* [*v. Ede's Ltd.*, 731 F.3d 1153, 1154 (5th Cir. 1984)] is there, and the authority upon which it was based has not been overruled. Moreover, we are unwilling to say that *Stern* does that job *sub silentio*, especially when the Supreme Court repeatedly emphasized that Stern had very limited application.

*Id.* at 407.

2.

The *Perdue* opinion illuminates two significant distinctions that exist between the Supreme Court's fee-shifting jurisprudence and our framework for analyzing professional compensation under 11 U.S.C. § 330(a). First, the *Johnson* factors are *personae non gratae* in *Perdue's* eyes. The decision casts them in a negative light, commenting that they provided "very little guidance," bestowed "unlimited discretion in trial judges and produced disparate results." *Perdue*, 130 S. Ct. at 1672. The Court goes on to state that the lodestar is the more favorable "alternative" to the *Johnson* factors, indicating that the lodestar has superseded the *Johnson* factors in the fee-shifting arena. *Id.* Conversely, we have never treated the lodestar and *Johnson* factors as mutually exclusive methods for determining reasonable compensation under either the Bankruptcy Act or the Bankruptcy Code. Instead, we have consistently viewed them as complimentary methodologies, using the lodestar as the starting point that yields a presumptively reasonable fee, and then permitting upward adjustments based on the factors set forth in *Johnson* and, after the 1994 amendment, § 330(a). *See, e.g., Cahill*, 428 F.3d at 540; *Lawler*, 807 F.2d at 1213 ("They are well entitled under the application of the *Johnson* factors to an award significantly above the lodestar.").

Second, our discussion in II.B., *supra*, illustrates that bankruptcy courts have discretion to enhance fees for professionals when their superior

performance produced outstanding results.  And, in accordance with that rule, we have affirmed fee awards that would have been proscribed under *Perdue*.  In *Rose Pass Mines*, for example, we affirmed the enhancement of an attorney's fee from $85.00 to $100.00 "despite [the attorney's] testimony that his *maximum fee* in bankruptcy matters had been $85 per hour."  615 F.2d at 1092 (emphasis added); *see also Consolidated Bancshares*, 785 F.2d at 1257 (explaining that fees may be enhanced under *Rose Pass Mines* "for a job performed in an excellent manner").  This fee award is inconsistent with *Perdue*, as it does not fall within any of the three circumstances where *Perdue* permits enhancements based on superior attorney performance.  The most notable distinction between the two cases is that *Perdue* permits enhancements "where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure *the attorney's true market value*."  *Perdue*, 130 S. Ct. at 1674 (emphasis added).  In *Rose Pass Mines*, on the other hand, we affirmed an enhancement despite the fact that the attorney was still receiving his market rate before the enhancement was taken into account.  615 F.2d at 1092.  Under our current framework, therefore, enhancements are possible in situations not delineated in *Perdue*.

The question thus becomes whether *Perdue* unequivocally, *sub silentio* overruled our bankruptcy framework, which currently permits bankruptcy courts to: (1) consider the *Johnson* factors after calculating the lodestar; and (2) award fee enhancements in situations that fall outside of the three specific circumstances set forth in *Perdue*.  *See Technical Automation*, 673 F.3d at 405 ("In the light of our prior panel precedent and our observance of the rule of orderliness, our inquiry turns to whether the Supreme Court's decision in *Stern v. Marshall* unequivocally, *sub silentio* overruled *Puryear*.").  We cannot say that it did.

No. 11-10774

We begin with the obvious: *Perdue* is a federal fee-shifting case. *Perdue*, 130 S. Ct. at 1672. The Court made this clear at the outset of the opinion and relied solely on its prior fee-shifting jurisprudence to support its holding. *See id.* at 1669, 1672–75. The opinion neither explicitly touched on bankruptcy law nor indicated that the Supreme Court intended *Perdue* to extend to non-fee-shifting cases.[17] We, therefore, take the Supreme Court at its word when it described *Perdue* as a federal fee-shifting case, and decline to extend it further. *See Perdue*, 130 S. Ct. at 1669; *see also Technical Automation*, 673 F.3d at 407 ("[W]e are unwilling to say that *Stern* does that job *sub silentio*, especially when the Supreme Court repeatedly emphasized that *Stern* had very limited application.").

There is also textual support for our decision. Unlike § 1988, which "[u]nfortunately . . . does not explain what Congress meant by a 'reasonable' fee," *Perdue*, 130 S. Ct. at 1671, § 330(a) provides specific considerations (i.e. the nature, extent, and value of the services) and six factors for bankruptcy courts to consider when determining a reasonable fee. *See* 11 U.S.C. § 330(a)(3). Section 330(a)(3)'s text also indicates that its list of factors is not exclusive: bankruptcy courts may consider "all relevant factors," thus courts may consider

---

[17] This lack of intent to extend *Perdue* is evidenced, for instance, by the fact that the three circumstances justifying a fee enhancement are essentially non-existent in the bankruptcy arena because they are already addressed by the Bankruptcy Code. Section 331 of the Bankruptcy Code enables professionals to request fee awards and expense reimbursements "every 120 days . . . or more often if the court permits," and to receive disbursements after notice and a hearing. 11 U.S.C. § 331. This provision eliminates the prospect that there could be either an "extraordinary outlay of expenses" or the "exceptional delay in the payment of fees" during a bankruptcy proceeding. *See Perdue*, 131 S. Ct. at 1674–75. Similarly, § 330(a)(3)(F) requires courts to consider whether "compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." 11 U.S.C. § 330(a)(3)(F). This alleviates *Perdue's* concern that "an enhancement may be appropriate so that an attorney is compensated at the rate that the attorney would receive in cases not governed by the federal fee-shifting statutes." *Perdue*, 130 S. Ct. at 1674. Accordingly, because the Bankruptcy Code renders *Perdue's* three "rare and exceptional" circumstances essentially non-existent in bankruptcy proceedings, we doubt that the Court intended for *Perdue* to extend to cases governed by § 330(a).

23

additional factors so long as they are relevant.[18] *See id.*; *see also Lan Assocs. XI*, 192 F.3 at 123 ("[T]he factors enumerated in section § 330(a) are not all-inclusive."); *In re Mkt. Ctr. E. Retail Prop., Inc.*, 469 B.R. 44, 52 (B.A.P. 10th Cir. 2012) ("The list contained in § 330(a)(3) is not meant to be exhaustive; had Congress wished to limit a bankruptcy court's consideration to the factors listed in § 330(a)(3), it knew how to do so."). This differs markedly from the nearly infallible role of the lodestar in fee-shifting cases, as, in those cases, the lodestar "figure includes most, if not all of the relevant factors constituting a 'reasonable' attorney's fee." *Perdue*, 130 S. Ct. at 1673. Accordingly, given the factors that bankruptcy courts are expected to consider under § 330(a)'s plain language, it is inappropriate to automatically extend *Perdue* into the bankruptcy arena.[19] *See also Mkt. Ctr. E. Retail Prop.*, 469 B.R. at 53 ("There are significant differences between fee awards in civil rights actions and bankruptcy cases.").

We are also persuaded by the fact that the Court's justifications for the holding in *Perdue* do not transfer to this case. Unlike cases under § 1988, where fee enhancements often come at the expense of the taxpayer, the public's purse

---

[18] This interpretation of § 330(a)(3) is also consistent with our past practice. We would not have continued to instruct courts that enhancements may be based on the *Johnson* factors if the factors listed in § 330(a)(3) were all-inclusive. *See Cahill*, 428 F.3d at 540.

[19] On a related point, the Trustee argues that we should extend *Perdue* because in the past we have relied on fee-shifting cases when resolving fee disputes in bankruptcy proceedings. We certainly agree that fee-shifting case law can provide persuasive authority, and we will likely continue to consider it in future cases. *See Fender*, 12 F.3d at 487. This is particularly true when the matter is one of first impression in the bankruptcy context. *See, e.g., Babcock & Wilcox Co.*, 526 F.3d at 827–28 (relying on a Voting Rights Act case when determining whether the bankruptcy court abused its discretion by reducing the attorney's fees for non-working travel time under § 330). We do not, however, automatically apply fee-shifting case law wholesale into the bankruptcy arena or automatically treat fee-shifting and bankruptcy cases as interchangeable. *See, e.g., First Colonial*, 544 F.2d at 1299 (extending the *Johnson* factors to bankruptcy but adding two additional considerations that were unique to bankruptcy law). And when a particular principle is well-settled in the bankruptcy arena, our panels may have no choice but to continue to abide by it, irrespective of the changes occurring in other, related areas of the law.

is left untouched in bankruptcy proceedings. The Trustee's related argument—that the enhancement comes at the expense of creditors[20]—is similarly unavailing where, as here, all creditors receive a 100% return on their claims.[21] The Debtors are the only party whose bottom-line was reduced by the enhancement and, because their own board of directors recommended paying the enhancement, we can hardly compare the Debtors' situation to that of the non-consenting taxpayers.

Likewise, in this case, we do not share *Perdue's* concern that defendants may be unwilling to settle cases when they can be exposed to the unconstrained, subjective discretion of the courts once it comes time to pay the plaintiff's tab. *See Perdue*, 130 S. Ct. at 1676. That concern makes sense in the § 1988 fee-shifting realm where, contrary to the American Rule, the "prevailing party" may recover fees and expenses from its adversary. This recovery necessarily involves the redistribution of a finite sum of money from the pocket of the adversary into the hands of the prevailing party. On the other hand, enhancements like the one sought by CRG are only paid in the parallel universe where everyone is a winner (e.g. because everyone has received 100 cents on the dollar). In these rare cases, the professionals may potentially receive an enhancement only after transforming a carcass into a cheetah, so to speak, thereby enlarging the pie that

---

[20] The Trustee states in his brief that "creditors primarily will bear the burden of those bonuses because creditors' claims are paid from the estate assets that remain after professionals' fees have been paid."

[21] At oral argument, the Trustee argued that there could be future cases where a bankruptcy court awards an enhancement even though all creditors were not paid in full. Such an enhancement, according to the Trustee, would be paid at the expense of creditors. That future case is not before us today, and we decline to definitively answer whether fee enhancements may ever be awarded when one or more creditors has not received 100 cents on the dollar. We merely note, on the other hand, that we have never sustained an enhancement where all creditors did not receive a 100% return and, given the Trustee's failure to cite one case to support its theory, we believe that such a situation is highly improbable.

is shared by all of the debtor's creditors.  In this parallel universe, there is no settling or losing party to protect from the discretion of the bankruptcy courts.[22]

In *Technical Automation*, we declined to extend *Stern v. Marshall* to Article I magistrate judges even though there are "many similarities" between the statutory powers of bankruptcy judges and those of magistrate judges. *Technical Automation*, 673 F.3d at 406–07.  Here, there are less similarities and significant textual and structural differences between fee-shifting and bankruptcy cases.  Given these differences, and the Supreme Court's failure to indicate that *Perdue* was intended to apply outside of the fee-shifting context, we hold that *Perdue* did not unequivocally, *sub silentio* overrule our existing bankruptcy framework merely because the lodestar is used in both types of cases.

## IV.

There may be sound justifications for implementing a *Perdue*-like approach to the compensation of professionals employed under § 330, but those justifications must be voiced to our *en banc* court, the Supreme Court, or Congress.  We hold that *Perdue* did not unequivocally, *sub silentio* overrule our prior precedent and we are, therefore, bound to apply it.  Accordingly, the bankruptcy court's order awarding CRG a $1 million fee enhancement is AFFIRMED.

---

[22] This is particularly true where, as here, the debtor's board of directors recommends paying the enhancement.