# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———

No. 12-40997

———

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 30, 2014

Lyle W. Cayce
Clerk

In the Matter of:  ASARCO, L.L.C.,

     Debtor

------------------------------

ASARCO, L.L.C.,

     Appellant

v.

JORDAN HYDEN WOMBLE CULBRETH & HOLZER, P.C.,

     Appellee

*****************************

Consolidated With
Case Nos. 12-40998 & 13-40409

In the Matter of:  ASARCO, L.L.C.,

     Debtor

------------------------------

ASARCO, L.L.C.,

     Appellant

v.

BAKER BOTTS, L. L. P.,

     Appellee

No. 12-40997, cons. w/
Nos. 12-40998 & 13-40409

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before STEWART, Chief Judge, and HIGGINBOTHAM and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Baker Botts and Jordan, Hyden, Womble, Culbreth & Holzer, P.C. ("Jordan Hyden") served as debtor's counsel to ASARCO LLC ("ASARCO") during its Chapter 11 bankruptcy and helped ASARCO confirm a reorganization plan that paid all of its creditors in full. The firms were well compensated pursuant to 11 U.S.C. § 330(a) for their fees and expenses for representing ASARCO. What remains to be decided, however, are two fee-related issues: whether the bankruptcy court abused its discretion in authorizing a 20% premium to Baker Botts and 10% premium to Jordan Hyden for their unusually successful fraudulent transfer litigation; and whether the bankruptcy court was authorized, consistent with 11 U.S.C. § 330, to award attorneys' fees to the firms for defending their fee applications in court. We affirm the awards of fee enhancements but reverse the awards of fees for litigating the firms' fee applications.

## I. Background

ASARCO is an integrated copper mining, smelting, and refining company.[1] ASARCO entered Chapter 11 bankruptcy in 2005 facing cash flow deficiencies, various environmental liabilities, and tax and labor problems. Two years before ASARCO commenced its bankruptcy case, its Parent company directed ASARCO

---

[1] ASARCO LLC is owned by ASARCO Incorporated, which is owned by Americas Mining Corporation, which is in turn owned by Grupo Mexico (collectively, ASARCO's "Parent").

No. 12-40997, cons. w/
Nos. 12-40998 & 13-40409

to transfer a controlling interest in Southern Copper Corporation ("SCC") to the Parent despite ASARCO's financial distress.

Baker Botts and Jordan Hyden successfully prosecuted complex fraudulent transfer claims to recover ASARCO's controlling interest in SCC (the "SCC Litigation"). The judgment against ASARCO's Parent, valued at between $7 and $10 billion, was the largest fraudulent transfer judgment in Chapter 11 history. After 52 months in bankruptcy, ASARCO emerged pursuant to a plan of reorganization in late 2009 (funded by its Parent as a result of the SCC Litigation) with little debt, $1.4 billion in cash, and the successful resolution of its environmental, asbestos and toxic tort claims.

In their final fee applications, Baker Botts and Jordan Hyden sought lodestar fees, expenses, a 20% fee enhancement for the entire case, and fees and expenses for preparing and litigating their final fee applications. ASARCO, now once again controlled by its Parent, challenged the fees on a large scale (a challenge that included a discovery request covering every document Baker Botts produced during the 52-month bankruptcy, resulting in the production of 2,350 boxes of hard copy documents and 189 GB of electronic data).[2] None of the objections to Bakers Botts's core fees were joined by the United States Trustee.

After a six-day fee trial, the bankruptcy court rejected all of ASARCO's objections to the core fee request and awarded more than $113 million to Baker Botts and $7 million to Jordan Hyden for core fees and expenses. Approving percentage fee enhancements only for the work they performed on the SCC Litigation (rather than, as requested, on the entire case), the court awarded Baker Botts an additional $4.1 million and Jordan Hyden over $125,000. The court's calculation was based on "rare and exceptional" performance and results in the adversary proceeding and a finding that the standard rates charged by

---

[2] ASARCO did not challenge Jordan Hyden's core fee application.

3

No. 12-40997, cons. w/
Nos. 12-40998 & 13-40409

Baker Botts were approximately 20% below the appropriate market rate. Finally, the court authorized fees and expenses for the firms' litigation in defense of their attorneys' fee claims, resulting in another $5 million (plus expenses) to Baker Botts and over $15,000 to Jordan Hyden.

On appeal to the district court, ASARCO abandoned its objections to the Baker Botts core fee award. The same judge who had presided over the SCC Litigation heard the appeal. The district court affirmed the fee enhancements, stating that "there is an abundance of evidence which supports [the bankruptcy] court's enhancement award . . . . A seven billion dollar judgment, which is recoverable, which saves a company, and funds a 100% recovery for all concerned is a once in a lifetime result." The district court agreed that Baker Botts's and Jordan Hyden's fees to defend their core fees were compensable, and it did not disturb the bankruptcy court's authorization to seek an award of appellate fees for the same purpose. Because the court also held that attorneys' fees were improperly awarded for Baker Botts's pursuit of its fee enhancement,[3] it remanded to the bankruptcy court to determine whether any of the firm's $5 million defense-fee award related to the enhancement.

On remand, the bankruptcy court concluded that all of the defense-fee award compensated Baker Botts for defending core fees incurred in connection with the case. On appeal, the district court affirmed the final award. The district court also held that the firms' appellate fees was permissible but premature. ASARCO has appealed.

## II. Standard of Review

A bankruptcy court has "broad discretion" to determine reasonable attorneys' fees, as the "bankruptcy court is more familiar with the actual services performed and has a far better means of knowing what is just and

---

[3] Baker Botts did not appeal this ruling.

No. 12-40997, cons. w/
Nos. 12-40998 & 13-40409

reasonable than an appellate court can have." *In re Lawler*, 807 F.2d 1207, 1211 (5th Cir. 1987) (internal quotation marks and citation omitted). Accordingly, we disturb a fee award only if the bankruptcy court abused its discretion. *Id.* "An abuse of discretion occurs where the bankruptcy court (1) applies an improper legal standard or follows improper procedures in calculating the fee award, or (2) rests its decision on findings of fact that are clearly erroneous." *In re Cahill*, 428 F.3d 536, 539 (5th Cir. 2005) (citation omitted). Under the clear error standard, we disturb factual findings only if "left with a firm and definite conviction that the bankruptcy court made a mistake." *Id.* at 542 (internal quotation marks and citation omitted).

We review a "district court's decision by applying the same standard of review to the bankruptcy court's conclusions of law and findings of fact that the district court applied." *Id.* at 539 (citation omitted).

### III.  Discussion

### A.  Fee Enhancement

Section 330(a)(3) of the Bankruptcy Code provides a non-exclusive list of factors that bear on a court's determination of the reasonable compensation for actual, necessary services and expenses rendered by attorneys and other court-supervised bankruptcy professionals. *See* 11 U.S.C. § 330(a)(1)(A). Thus,

> [T]he court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

No.  12-40997, cons. w/
Nos. 12-40998 & 13-40409

> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

Elaborating on this provision, bankruptcy courts use the lodestar method, multiplying the number of hours of work performed by attorneys and paraprofessionals by the hourly rates of each.  The total yields a lodestar amount. *In re Pilgrim's Pride Corp.*, 690 F.3d 650, 654–55 (5th Cir. 2012) (citing *Lawler*, 807 F.2d at 1211).  "[A]fter calculating the lodestar, bankruptcy courts retain[ ] the discretion to adjust the lodestar upwards or downwards to reflect their consideration of the *Johnson* factors."  *Id.*; *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).  *See also* 11 U.S.C. § 330(a)(2).  The twelve *Johnson* factors are:

> (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the *results obtained*; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases.

*Pilgrim's Pride*, 690 F.3d at 654 (citations omitted) (emphasis added).

This court has clarified that Section 330(a), the lodestar method, and the *Johnson* factors work in conjunction with each other to guide the court's discretion.  *Id.* at 656 (citing *Cahill*, 428 F.3d at 539–40).  Because the four *Johnson* factors related to attorney skill and legal complexity are presumably

6

No.  12-40997, cons. w/
Nos. 12-40998 & 13-40409

fully reflected in the lodestar, those four factors can only form the basis for a fee enhancement in "rare and exceptional circumstances."  *Id.* (citations omitted).

Although these general, well understood standards cover nearly all bankruptcy fee applications, the bankruptcy court here broke out of the usual lodestar mode by authorizing fee enhancements equal to 20% and 10%, respectively, of each firm's attorneys' fees for pursuing the SCC Litigation. ASARCO takes a swipe at arguing that bankruptcy fee enhancements are never allowable solely for extraordinary attorney performance and results obtained. More pointedly, ASARCO challenges the lower courts' additional findings of fact and their degree of articulation of the basis for the additurs.  We address each of appellant's arguments.

ASARCO argues that the Supreme Court decision in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010) prohibits court awarded fee enhancements subject to only three exceptions, and that neither law firm's enhancement request satisfies any of the exceptions.[4] *Perdue* dealt with fee-shifting in civil rights cases.  42 U.S.C. § 1988.  In *Pilgrim's Pride*, however, this court stated explicitly that *Perdue* did not overrule this circuit's bankruptcy precedent authorizing fee enhancements under other, albeit limited circumstances pursuant to Section 330(a).  *Pilgrim's Pride*, 690 F.3d at 660–67. Nowhere does  *Pilgrim's Pride* indicate that *Perdue* removes the discretion of bankruptcy courts to award a fee enhancement in rare and exceptional circumstances.  The only relevant distinguishing factor that ASARCO points to is that in *Pilgrim's Pride* the debtor's board recommended paying the

---

[4]    The three exceptions are: (1) the hourly rate used for the lodestar does not adequately measure the attorneys' "true market value"; (2) the attorneys' performance included an "extraordinary outlay of expenses and the litigation is exceptionally protracted"; (3) the attorneys' performance involved an "exceptional delay in the payment of fees." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554–56, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010).

enhancement, while in this case ASARCO's board did not.[5]  The Supreme Court in *Perdue* was greatly concerned with protecting the taxpayers who would fund any enhanced fees, 559 U.S. at 559, 130 S. Ct. at 1677,  but this court in *Pilgrim's Pride* rejected the Trustee's argument that the creditors would fund the enhanced fees in a similar fashion because the creditors were paid in full. 690 F.3d at 666.  Here, too, the creditors have been or will be paid in full.  The real difference, then, is that the Trustee here did not object and the debtor did not consent.   That is an inconsequential distinction.   *Pilgrim's Pride* is controlling in bankruptcy fee matters, at least where a reorganization plan pays creditors' claims in full.

ASARCO's contention that the judgment the firms achieved in the fraudulent transfer litigation was not "rare and exceptional" falls flat.   In affirming the bankruptcy court's fee enhancement, the district court, which tried and rendered judgment in the SCC Litigation, stated that "there is an abundance of evidence which supports [the bankruptcy] court's enhancement award . . . .  A seven billion dollar judgment, which is recoverable, which saves a company, and funds a 100% recovery for all concerned is a once in a lifetime result."  We do not disagree with the lower courts' effusive evaluations of the results obtained.

Irrespective of exceptional results, ASARCO maintains that this court has never affirmed such a fee enhancement without some additional compelling factor.  ASARCO argues, for instance, that the fees in *Pilgrim's Pride* were consented to, that the attorneys demonstrated exceptional efficiency, and that they had otherwise been compensated at below market rates.  *See id*. at 653. The enhancement in *Rose Pass Mines* was also allegedly based on below market

---

[5]  Before the Parent regained control of reorganized ASARCO, ASARCO's board voted to consent to an enhancement, but the board did not have the authority to approve payments exceeding $1 million without the Parent's approval and that approval was never granted.

No.  12-40997, cons. w/
Nos. 12-40998 & 13-40409

rates.  *See Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1092 (5th Cir. 1980).

ASARCO further argues that the enhancement in *Lawler* was justified by a risk

of non-payment.  *See Lawler*, 807 F.2d at 1212–13.  As discussed above, consent

does not materially distinguish *Pilgrim's Pride*, especially where that lack of

consent issued from an adversary Parent.  The court in *Pilgrim's Pride* did note

how quickly Pilgrim's Pride emerged from bankruptcy, but immediately before

doing so it observed that "[o]ne hundred percent dividend cases are rare in

Chapter 11, and rarer still in large cases such as this." *Pilgrim's Pride*, 690 F.3d

at 653.  The *Rose Pass Mines* court pointed out that the hourly rate used to

calculate the lodestar was at "the lower limit of fees customarily charged," but

it also approved the bankruptcy court finding that  the "unusually good result"

was due to "excellent services" rendered by the attorneys.  *Rose Pass Mines*,

615 F.2d at 1090, 1092 (internal quotation marks and alteration omitted).  While

this court reduced, but did not eliminate, the enhancement awarded in *Lawler*

based on the bankruptcy court's finding that the fee was substantially

contingent, it commended the attorneys as "well entitled under the application

of the *Johnson* factors to an award significantly above the lodestar" based on

"outstanding professional accomplishment in this case."  *Lawler*, 807 F.2d at

1213.  In none of the three cases did this court state that some "plus factor"

beyond exceptional performance and results was required for a fee enhancement.

Indeed, doing so would be unnecessarily redundant of the *Johnson* factors.

In further critique of the enhancements for the SCC Litigation, ASARCO

challenges the bankruptcy court's finding that Baker Botts's rates were "below-

market," a fact that reinforced the court's fee enhancement decision.  The court,

however, amply documented its finding by reference to Baker Botts's customary

practices, the charges of competitive firms in Texas, and the charges by

comparable firms when representing parties to Chapter 11 cases pending in

No.  12-40997, cons. w/
Nos. 12-40998 & 13-40409

Texas.  Because this court, like the Supreme Court, has not held that reasonable attorneys' fees in federal court have been "nationalized," the bankruptcy court's charts comparing general hourly rates of out-of-state firms and rates charged in cases pending in other circuits are not relevant.  *Cf. Perdue*, 557 U.S. at 551 (the lodestar looks to "the prevailing market rates in the relevant community"); *McClain v. Lufkin Indust., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011) (court can look to the market rate for fees outside the forum only where attorneys from outside the forum are necessary).  The court's findings, however, were premised on sufficient probative and relevant data to withstand ASARCO's clear error challenge.

ASARCO next contends that its arguments apply equally to Jordan Hyden and that, even if exceptional performance and results alone could justify an enhancement, Jordan Hyden's role in the SCC Litigation was largely administrative and undeserving of an enhancement.  Jordan Hyden counters that it played an integral role in the SCC Litigation.  While Jordan Hyden served as local counsel, the enhancement it received was less than 3% of that awarded to Baker Botts.  The district court also addressed Jordan Hyden's importance at length, finding that its services were "necessary to the trial," "essential to the overall result," "necessary to the result," and "part and parcel of the same team effort that achieved an extraordinary result."  There is no clear error.

ASARCO finally asserts that the fee enhancement was not "supported by both specific evidence on the record and detailed findings by the lower courts." *Pilgrim's Pride*, 690 F.3d at 656 (internal quotation marks and citations omitted).  We disagree.  The bankruptcy court explained in detail how "rare and exceptional" the circumstances are.  The bankruptcy court found that "Baker Botts's services were instrumental in producing the exceptional results."  Baker

No. 12-40997, cons. w/
Nos. 12-40998 & 13-40409

Botts addressed "an array of challenging legal issues with sophistication, creativity, and skill," something for which the court considered "[f]ew firms in the country to have the breadth and depth of experience in different disciplines necessary." "Baker Botts performed at an exemplary level in a wide spectrum of legal specialties." The results were "nothing less than extraordinary," that is, "probably the most successful Chapter 11 of any magnitude in the history of the [Bankruptcy] Code." Baker Botts "contributed significantly" by performing in "an extraordinary fashion in numerous areas." The court added that "[s]uch an extraordinary result would have seemed far fetched at the outset" of the bankruptcy as "[c]reditors were expected to receive cents on the dollar." The result was that "ASARCO was transformed from a broke and broken company to a reorganized ASARCO, cleansed of its historical liabilities and well-positioned to compete effectively in the world of commerce." While pouring accolades on the firm's overall representation of the debtor, however, the bankruptcy court did not award Baker Botts (or Jordan Hyden) an enhancement for most of its work because, as the court found, a number of factors converged to enable a successful reorganization.

The court singled out the firms' prosecution of the SCC Litigation for fee enhancement precisely because it ascribed success to their efforts alone. The court described the SCC Litigation as ASARCO's "crown jewel." "Baker Botts was able to quickly and efficiently" prevail "[t]hrough its creativity, tenacity, and legal talent." The court found the results "were due to Baker Botts's performance and not to inferior performance by opposing counsel, unanticipated defense concessions, unexpectedly favorable rulings, a sympathetic fact-finder, or simple luck." Most impressive, Baker Botts won the trial "by deciphering millions of pages of documents and using those documents to tell a compelling story primarily out of the mouths of adverse witnesses." The result was a

judgment "valued in excess of $6 billion" that was "most likely the largest fraudulent transfer verdict in United States history." That judgment "promised a far more meaningful recovery for creditors than originally anticipated" because of results achieved by Baker Botts that were "without question, rare and extraordinary by any possible measure." The bankruptcy court could hardly have been more specific and detailed as to Baker Botts's "rare and exceptional" performance than it was while placing this description in the context of its 85-page opinion on fees.

The bankruptcy court also found that Jordan Hyden was "involved in the overall planning and strategy with Baker Botts" and active at both the "top strategy level" and in the "day-to-day, often emergency, work" of the bankruptcy. Regarding the SCC Litigation, Jordan Hyden was "not an active trial participant" but prepared "twice-daily summaries of the trial" that "kept the entire Chapter 11 teams of lawyers and staff up to date on the SCC Litigation" and "assisted in the physical planning of [the] trial." Consequently, Jordan Hyden's attorneys were an integral part of a successful team effort that was central to the success of the bankruptcy, and the bankruptcy court was within its discretion to award Jordan Hyden the modest fee enhancement.

## B. Fees for Defense of Fees

The parties debate at length the bankruptcy court's award of counsel fees for counsel's defense of their fees for representing the debtor. The issues presented transcend debtor's counsel, because Section 330(a) governs compensation of all professionals whose fees are paid by the bankruptcy estate.[6]

---

[6] After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103–(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and

Case law addressing this question is divided, *see generally* 3 COLLIER ON BANKRUPTCY ¶ 330.03[16][a] (16th ed. 2013). We conclude that, correctly read, Section 330(a) does not authorize compensation for the costs counsel or professionals bear to defend their fee applications.

Relevant here, Section 330(a)(3) instructs the court to consider "all relevant factors" concerning the professional services rendered, "including" "whether their services were necessary for the administration of, or beneficial . . . toward the completion of a case . . . ," and "whether the compensation is reasonable" based on charges by comparable practitioners in non-bankruptcy cases. Section 330(a)(3)(C), (F). Compensation is not allowed for services that were not reasonably likely to benefit the debtor's estate *or* necessary to case administration. Section 330(a)(4)(with immaterial exceptions). Finally, "[a]ny compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application." Section 330(a)(6).

Parties in interest as well as the United States Trustee are entitled to receive notice and the opportunity for a hearing to question bankruptcy professional fees. Section 330(a)(1). Implicit in this procedure is the possibility of fee litigation. Nevertheless, Section 330 states twice, in both positive and negative terms paraphrased above, that professional services are compensable only if they are likely to benefit a debtor's estate or are necessary to case administration. *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414, 418 n.7 (5th Cir. 1998). The primary beneficiary of a professional fee application, of course, is the professional. While the debtor's estate or its administration must have benefitted from the services rendered, the debtor's estate, and therefore

---

by any paraprofessional person employed by any such person; and (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

normally the creditors, bear the cost. This straightforward reading strongly suggests that fees for defense of a fee application are not compensable from the debtor's estate. The Eleventh Circuit adopted this interpretation in a factually similar case, holding that ". . . the issue is whether the services rendered were reasonable and necessary to the administration of the estate. [internal citation omitted] The answer to this question is no. The subject of the [appeal and cross-appeal] was the fee to be paid to Bergwerk for his services rendered in the administration of the estate. The appeals brought absolutely no benefit to the estate, the creditors, or the debtor." *Grant v. George Schumann Tire & Batt. Co.*, 908 F.2d 874, 882-83 (11th Cir. 1990).

Further supporting this interpretation is Section 330(a)(6), which limits potential professional fees in two ways. First, the specification of an award for "preparation of a fee application" is clearly different from authorizing fees for the defense of the application in a court hearing. Second, tailoring the award to the "level and skill reasonably required to prepare the application" emphasizes scrivener's skills over other professional work. It is untenable to construe this language alone to encompass satellite litigation over a fee application. Had Congress intended compensation for professional fee applications to be allowable as "reasonable and necessary" under Section 330(a)(3)(C), there would have been no need to create the limits specified in subdivision (4). The broad reading of Section 330(a)(3)(C) urged by Baker Botts would render Section 330(a)(4) superfluous.

Several arguments are made in favor of reimbursing fees for the defense of fees from the debtor's estate. One argument is that because resolving professional fees is required to close a case, their litigation is a reasonable and necessary aspect of estate administration. *See In re Smith*, 317 F.3d 918, 929 (9th Cir. 2002). The *Smith* court ultimately held that such compensation rests

No.  12-40997, cons. w/
Nos. 12-40998 & 13-40409

within the bankruptcy court's discretion to award fees for "reasonable and necessary" work, but it also recognized circumstances, such as counsel's failure in defending its fees, where awards would not be permissible.  *In re Smith*, 317 F.3d at 927-929.   The *Smith* court posited a broader scope for the Section 330(a) test for the reasonableness and necessity of services to the debtor's estate than does *Grant*, but we agree with *Grant*'s view as more closely reflecting the statute's plain meaning.

*In re Smith* actually demonstrates the tension in applying the test of reasonableness and necessity *to the debtor's estate* when it comes to litigation over fee applications in bankruptcy.   It cannot be denied that in bankruptcy, "almost everyone loses something."  *Grant*, 908 F.2d at 882 (internal quotation omitted).   In ordinary cases, where there is no 100% payout to creditors, every dollar paid for administrative expenses including professional fees detracts from the unsecured creditors' recovery.  Litigation of professionals' fee applications may become substantial, costly and time-consuming if counsel can be compensated for their self-interested efforts.  Such litigation is detrimental for the debtor if it simply increases the overall administrative costs of the bankruptcy.  Moreover, bankruptcy rules require professionals to justify their fee applications with detailed, itemized billing records precisely to assure their integrity and sharpen any potential disputes.  *See*, *e.g.*, Fed. R. Bankr. P. 2016; Bankr. S.D. Tex. R. 2016-1.  Compliance with the rules should ordinarily reduce the need for or likelihood of success of satellite litigation over fees.

Baker Botts analogizes granting "fees for fee defense" in bankruptcy to the procedure under federal fee shifting statutes, where counsel's time spent to prepare, litigate and appeal a fee award is often compensable.  *See, e.g., Cruz v. Hauck*, 762 F.2d 1230, 1233-34 (5th Cir. 1985)(interpreting 42 U.S.C. § 1988).  We disagree.   These fee shifting statutes create an incentive for otherwise

15

financially disadvantaged plaintiffs to obtain legal redress. Because Congress designed fee shifting provisions in express derogation of the American Rule that each party to litigation bears its own costs, the losing party should bear the full costs of counsel for the winner. In bankruptcy, the equities are quite different. Both the debtor and creditors have enforceable rights, and there is a limited pool of assets to satisfy those rights and compensate court-approved professionals; in certain cases, moreover, professionals paid from the debtor's estate represent competing interests. No side wears the black hat for administrative fee purposes. In the absence of explicit statutory guidance, requiring professionals to defend their fee applications as a cost of doing business is consistent with the reality of the bankruptcy process.[7] The perverse incentives that could arise from paying the bankruptcy professionals to engage in satellite fee litigation are easy to conceive.

Another argument favoring compensation for "fees for fee defense" rests on Section 330(a)(4), the comparability factor. Without reimbursement for "defense fees," it is contended, a professional firm's compensation will be unfairly diluted below what comparably skilled practitioners receive in non-bankruptcy cases. This case, in which Baker Botts expended $5 million to defend its core fee award of over $113 million (excluding the enhancement), allegedly epitomizes such dilution. The claim for comparability is easily made but difficult to analyze. The Bankruptcy Code plainly intended to erase the "economy of the estate" rule under pre-existing law and thus raise the professional fees. *In re Pilgrim's Pride*, 690 F.3d at 654-55. Beyond that, there is no litmus test to determine the comparability of professional services in bankruptcy and other practice areas. Applying reasonably comparable hourly rates and adjusting professional

---

[7]    When firms become aware that they may not be reimbursed for defending core fee applications, they can anticipate this possibility in their hourly rates and by thoroughly documenting fee applications.

compensation in light of specific circumstances maintain rough comparability in practice. More cannot easily be demanded. Some courts, under the aegis of enforcing comparability, have even withheld fee enhancements to bankruptcy firms because they are not customary in transactional representation, *see Matter of UNR Industries, Inc.*, 986 F.2d 207, 209-210 (7th Cir. 1993). Others have noted that professional bankruptcy rates have sometimes outpaced those of other practice areas. 3 COLLIER ON BANKRUPTCY ¶ 330.03[12] (16th ed. 2013). In this case, the huge cost of defending Baker Botts's core fees seems a drastic reduction in absolute terms, but it amounts to only about 4.4% of the core fee. Whether a deduction of this percentage renders the core fee non-comparable to charges by equally skilled practitioners in other types of legal practice is in the eye of the beholder.

One astute bankruptcy court turned a claim of dilution for non-comparable fees against the professional fee applicant with the following reasoning: "Because the American Rule applies absent explicit statutory or contractual authority, and because the Code contains no statutory provision for the recovery of attorney fees for *defending* a fee application, counsel should *not* normally be able to recover fees for defending a fee application in the bankruptcy court." *In re Teraforce Tech. Corp.*, 347 B.R. 838, 867 (Bankr. ND Tex. 2006) (emphasis added). *See also In re Frazin*, 413 B.R. 378, 400-07 (Bankr. N.D. Tex. 2009), *In re JNS Aviation, LLC*, No. 04-21055-RLJ-7, 2009 WL 80202 (Bankr. N.D. Tex. 2009) (adopting *Teraforce*). In federal court, the American Rule prohibits awards of counsel fees to a prevailing party absent statutory authority, contractual authorization, or "special circumstances." *In re Teraforce*, 347 B.R. at 866 n.64. Baker Botts asserts that the American Rule is inapplicable in bankruptcy, because the statutory provision for professional compensation overrides the American Rule. The only authority cited for this proposition is a footnote in

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y.*, 421 U.S. 240, 260 n.33, 95 S. Ct. 1612, 1623 n.33, 44 L. Ed. 2d 141 (1975) (citing the Bankruptcy Act of 1898 as an example of an explicit statutory fee provision to which the American Rule did not apply). More important than the extensive list of federal statutes cited by the Court in that footnote, however, is the accompanying text:

> What Congress has done, while fully recognizing and accepting the general rule, is to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights. [fn. omitted]. These statutory allowances are now available in a variety of circumstances, *but they also differ considerably among themselves.*

*Id*. (emphasis added). The Court in *Alyeska* was hardly endorsing the interpretation of Section 330 fee compensation that Baker Botts persuaded the bankruptcy court to adopt. In any event, the Bankruptcy Act's compensation provision was significantly reworked by the more elaborate framework of Section 330, and, as has been discussed, Section 330 is not fairly read to include "fees for defense of fees" either as reasonable, necessary costs of case administration or to prevent dilution of the professional firm's core fees.

Finally, the bankruptcy court here repeatedly expressed concern that if "fees for defense of fees" cannot be awarded to professionals under Section 330, there will be an incentive for parties in interest, any of which can object to professional fees, to "mount objections to extract a fee reduction." The prospect of such objections, in turn, might discourage competent counsel from handling bankruptcy cases. This court, in contrast, observed years ago that, "Too frequently, court-appointed counsel for debtor['s] and the official creditor committees' interests in a case, sharing the mutual goal of securing approval for their fees, enter into a conspiracy of silence with regard to contesting each other's fee applications." *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1255 (5th Cir. 1986).

No.  12-40997, cons. w/
Nos. 12-40998 & 13-40409

Be that as it may, this opinion should not be read as encouraging tactical or ill-supported objections to fee applications. The Bankruptcy Code and rules require ample documentation of fee requests in part to deter satellite litigation. Section 330's capacious reasonableness and necessity standards shield even many unsuccessful professional actions in bankruptcy from attempts at fee reduction. We are confident that bankruptcy courts, practicing vigilance and sound case management, can thwart punitive or excessively costly attacks on professional fee applications. Where appropriate, the courts should not hesitate to implement the exception to the American Rule that allows fee shifting where an adverse party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46, 111 S. Ct. 2123 (1991); *In re Frazin*, *supra*, 413 B.R. at 403.  (No issues falling within *Chambers* were raised in response to reorganized ASARCO's fee objections here.)

## Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED as to fee enhancements awarded to Baker Botts and Jordan Hyden but REVERSED as to additional fee awards for litigation concerning their fee applications.

**AFFIRMED IN PART, REVERSED IN PART.**